UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| COUPLED PRODUCTS, LLC | CIVIL ACTION NO. 09-0323 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| NOBEL AUTOMOTIVE MEXICO LLC, ET AL. | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court following a Markman hearing and supplemental briefing by Nobel Automotive Mexico, LLC, Nobel Automotive Ohio, LLC, and Coupled Products, LLC. See Record Documents 112, 121, 128. After considering the submissions and the arguments of counsel, the Court issues the following order regarding claim construction.

**I.    BACKGROUND.**

This is a patent case. On April 25, 2006, the United States Patent and Trademark Office ("PTO") issued U.S. Patent No. 7,032,500 ("the 500 Patent"), entitled "Single Point Steering Gear Hydraulic Connection." Record Document 68 at ¶ 8. The 500 Patent was issued to three inventors, Daryl Sinclair, Jim Beatty, and Alexander Grant. See Record Document 81, Exhibit A (the 500 Patent). It matured from an application filed August 27, 2004. See id.

Coupled Products, LLC ("Coupled Products") alleges it owns, by assignment, the 500 Patent. See Record Document 68 at ¶ 9. Coupled Products contends that Nobel Automotive Mexico, LLC and Nobel Automotive Ohio, LLC ("the Nobel Defendants") have willfully infringed the 500 Patent. See id. at ¶¶ 10-21.

The 500 Patent "provides a fluid flow assembly for a power steering system."

Record Document 81, Exhibit A at Column 1, Lines 43-44. The 500 Patent summarizes the invention:

> A fluid flow assembly in accordance with the present invention includes first and second hose assemblies each disposed between a pump and a steering gear. The first hose assembly provides pressurized fluid from the pump to the steering gear. The second hose assembly returns fluid from the steering gear to the pump. The fluid flow assembly further includes a bracket configured for connecting the hose assemblies to the steering gear. The bracket includes a first portion defining a first aperture through which one of the first and second hose assemblies extends. The bracket further defines a second portion defining a deformable finger extending from the first portion. The first and second portions define a notch formed in a perimeter of the bracket. The notch is configured to receive another of the first and second hose assemblies and the second portion is deformed after insertion of the another hose assembly to retain the another hose assembly within the notch.
>
> A fluid flow assembly for a power steering system in accordance with the present invention is advantageous. The assembly enables a secure, simultaneous connection of both the supply and return hose assemblies to the steering gear using a bracket without the need for additional parts. In one embodiment of the inventions, grooves are also formed in each hose assembly configured to receive seals thereby eliminating the need to form grooves in the steering gear housing and further simplifying assembly.

Id. at Column 1, Lines 45-67 through Column 2, Lines 1-3.

## II. GENERAL PRINCIPLES GOVERNING CLAIM CONSTRUCTION.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). To determine the meaning of the claims, courts start by considering the intrinsic evidence. See id. at 1313; see also C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 861 (Fed. Cir. 2004); Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. See Phillips, 415 F.3d at 1314; C.R. Bard, Inc., 388 F.3d at 861. Courts give claim terms their ordinary

and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. See Phillips, 415 F.3d at 1312-1313; Alloc, Inc. v. Int'l Trade Comm'n, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. See Phillips, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. See id. Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. See id. The differences among the claim terms can also assist in understanding a term's meaning. See id.

"[C]laims must be read in view of the specification, of which they are a part." Id. at 1315. "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Id. This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. See id. at 1316. In these situations, the inventor's lexicography governs. See id. The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir.1998); see also Phillips, 415 F.3d at 1323. The prosecution history is another tool to

supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. See Home Diagnostics, Inc., v. Lifescan, Inc., 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." Phillips, 415 F.3d at 1317. Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. See id. at 1318. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." Id.

### III. DISPUTED CLAIM TERMS.

During the Markman hearing, the Court granted leave to amend the Claim Construction Chart. See Record Document 112. Following the hearing, the parties submitted an Amended Joint Claim Construction Chart (Record Document 120), which now governs the Court's analysis of the disputed claim terms. Moreover, the parties note in the Amended Joint Claim Construction Chart that "where terms are not addressed, the parties agree that no construction is required." Id. at 1.

**A.      Claim Term: "disposed between a pump and a steering gear" [Claims 1 and 8]**

| Coupled Products' Proposed Construction | Nobel Defendants' Proposed Construction |
|---|---|
| Plain meaning | arranged from a connection at a pump to a connection at a steering gear |

Claims 1 and 8 both refer to first and second hose assemblies disposed between a pump and a steering gear.  See Record Document 81, Exhibit A (Claims 1 and 8) (emphasis added).  During the Markman hearing, the Court advised the parties that his inclination was to apply a plain language meaning to the phrase "disposed between a pump and a steering gear."  See Record Document 113 at 6, 43.  After further review of the claim construction/Markman record, the Court again finds that the phrase "disposed between a pump and a steering gear" requires no special construction.  The disputed claim language requiring the first and second hose assemblies to be "disposed between a pump and a steering gear" does not necessarily require that the hose assemblies be arranged from a connection at a pump to a connection at a steering gear, as proposed by the Nobel Defendants.  This Court cannot conclude that the patentees unambiguously limited the scope of the claimed invention by requiring a structural connection to a pump and steering gear.  See Record Document 81 at 10.  For the Court to do so here would be to impermissibly read a limitation into the claims and to alter the scope of such claims.  See Embrex, Inc. v. Service Engineering Corp., 216 F.3d 1343, 1347 (Fed. Cir. 2000) ("The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims.").

Coupled Products concedes that "Claim 1 reads on a connected system." Document 128 at 9. Yet, it argues that the Nobel Defendants' proposed construction adds an improper limitation, as it requires a special type of pump and steering gear *connection*. See id. (emphasis added). Coupled Products argues, and this Court agrees, that the proper reading of the phrase "disposed between a pump and a steering gear" is its plain meaning which simply specifies a location for the hose assemblies. The proposed construction adds the requirement for a certain type of connection when the patent itself does not limit the ways of connecting the hose assemblies. The Court further agrees with Coupled Products that the proposed construction using "arranged" is ambiguous and will not be more easily understood by the jury than the plain and ordinary meaning of the word "disposed." Accordingly, the Court finds that the claim term "disposed between a pump and a steering gear" should be given its plain and ordinary meaning as to both Claims 1 and 8.

    **1.    A Pump and A Steering Gear: Structural Limitations of Claim 1?**

During the Markman hearing, counsel for the Nobel Defendants stated that he believed Coupled Products agreed that "the pump and steering gear are structural limitations of the claim." Record Document 113 at 28, 42. Coupled Products disagreed as to Claim 1 and additional briefing was filed as to this issue. See id. at 28, 125; see also Record Documents 121 and 128.

The Court concurs with the argument presented by Coupled Products on this issue and holds that Claim 1 does not recite a pump and/or a steering gear as claim limitations. See Record Document 113 at 124-129; Record Document 128. A comparison of Claims

1 and 8, particularly the preambles[1], highlights the distinction between the two claims:

> Claim 1
>
> A **fluid flow assembly for a power steering system**, comprising:
> first and second hose assemblies each disposed between a pump and a steering gear, said first hose assembly providing pressurized fluid from said pump to said pump to said steering gear and said second hose assembly returning fluid from said steering gear to said pump . . .
>
> Claim 8
>
> A **power steering assembly**, comprising:
> **a pump;**
> **a steering gear;**
> first and second hose assemblies each disposed between said pump and said steering gear, said first hose assembly providing pressurized fluid from said pump to said pump to said steering gear and said second hose assembly returning fluid from said steering gear to said pump . . .

Record Document 81, Exhibit A (Claims 1 and 8) (emphasis added). The Court finds that the full claim language of Claims 1 and 8 are instructive. Claim 1, as compared to Claim 8, does not require "a pump" and "a steering gear," but rather requires hose assemblies "disposed between a pump and a steering gear." As stated previously by the Court, "disposed between a pump and a steering gear" simply references the location for the hose assemblies. Simply put, "disposed between a pump and a steering gear" states the location of the hose assemblies in Claim 1, but does not make the pump and the steering gear claim limitations as Claim 8 does.

The Nobel Defendants seem to be attempting to limit Claim 1 to the preferred embodiment in the patent. See Comark Communications, Inc., 156 F.3d at 1187

---

[1] A preamble is properly considered a limitation of a claim "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 239 F.3d 801, 808 (Fed. Cir.2001).

("Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."). Moreover, the Court finds that if Claim 1 is read to require the pump and the steering gears as limitations, then Claims 1 and 8 are entirely redundant, as are their dependent claims. See id. (" While we recognize that the doctrine of claim differentiation is not a hard and fast rule of construction, it does create a presumption that each claim in a patent has a different scope. There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant."). The Nobel Defendants' argument based on the "all elements" or "all limitations" rule also appears to be misplaced, as it is a rule to establish infringement. See Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535 (Fed. Cir.1991) (holding that to establish infringement, the plaintiff must prove by a preponderance of the evidence that every limitation set forth in a patent claim is found in the accused product or process either literally or by a substantial equivalent."); see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29, 117 S.Ct. 1040, 1049 (1997).

**B. Claim Term: "bracket configured for connecting said first and second hose assemblies to said steering gear" [Claims 1 and 8]**

| Coupled Products' Proposed Construction | Nobel Defendants' Proposed Construction |
|---|---|
| Plain meaning | a connecting plate fitted to attach to the housing of the steering gear and securely seat the hose assemblies in the respective ports of the steering gear |

Claims 1 and 8 recite, in pertinent part:

*a bracket configured for connecting said first and second hose assemblies to said steering gear*, said bracket including . . . .

Record Document 81, Exhibit A (Claims 1 and 8) (emphasis added).

Again, during the Markman hearing, the Court advised the parties that it believed "the plain language aptly describe[d]" the disputed term and that the Nobel Defendants' proposed construction language did not seem to advance the jury's understanding. Record Document 113 at 59, 61-63. The Court maintains its previous position and again finds that the plain language meaning of the phrase "bracket configured for connecting said first and second hose assemblies to said steering gear" is appropriate and there is no need for a special construction.

The Nobel Defendants' proposed construction changes "bracket" to "plate," thereby eliminating all other types of brackets. The Court cannot conclude that the patentees unambiguously limited the scope of the claimed invention to require a plate to the exclusion of all other brackets. The proposed construction further requires that the connecting plate be "fitted to attach to the housing of the steering gear," thereby adding a limitation to the

claim. The language in Claims 1 and 8 requires "connecting," not to "*securely* seat the hose assemblies." Thus, it appears that the Nobel Defendants' proposal would also impermissibly import the function of a secure connection. See Wenger Mfg., Inc. v. Coating Machinery Systems, Inc., 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("A court may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function.").

The Nobel Defendants' argument that "bracket" is meaningless to one of skill in the art is also unpersuasive. The intrinsic record evidences otherwise, as both the Examiner and the inventors understood the term "bracket." See Record Document 81, Exhibit B. In the Reasons for Allowance, the Examiner specifically referenced the "bracket" and noted that the Nakajima and Florence patents both also disclosed a bracket. See id. at FH 000014. In the 500 Patent, the inventors state that "conventional assemblies include a variety of brackets that are used to support and mount the hose assemblies within a vehicle." Id., Exhibit A at Column 1, Lines 16-18. The inventors then continued to use the term "bracket" throughout the specification. Thus, it is clear to the Court that the ordinary and accustomed meaning of the term "bracket" is understood by one of ordinary skill in the art at the time of the invention in the context of the entire 500 Patent. See Phillips, 415 F.3d at 1312–1313; Alloc, Inc. v. Int'l Trade Comm'n, 342 F.3d at 1368.

C. **Claim Term: "deformable finger" [Claims 1 and 8]**

| Coupled Products' Proposed Construction | Nobel Defendants' Proposed Construction |
|---|---|
| an extension from first portion 44 that can be deformed, such as by moving end portion 58 in a counter-clockwise direction towards first portion 42 | a projecting piece of bracket designed to be bent around an inserted hose assembly thus holding the hose assembly securely in place |

Claims 1 and 8 provide, in pertinent part:

> a bracket configured for connecting said first and second hose assemblies to said steering gear, said bracket including: a first portion defining a first aperture through which one of said first and second hose assemblies extends; a second portion defining a *deformable finger* extending from said first portion[,] said first and second portions defining a first notch . . . .

Record Document 81, Exhibit A (Claims 1 and 8) (emphasis added).

The Nobel Defendants base their proposed construction of "deformable finger" on the specification, arguing that the "bent feature" is essential to the construction because "in order for the deformable finger . . . to retain the hose assembly it must necessarily be bent around the hose assembly." Record Document 82 at 17, 19. They note that the specification further provides that the purpose of the alleged invention is to provide an assembly that enables a secure, simultaneous connection of both the supply and return hose assemblies to the steering gear using a bracket without the need for additional parts. See id. at 17. Based on this purpose, the Nobel Defendants argue that the specification and claim language make clear that the deformable finger is a projecting piece of the bracket designed to be bent around an inserted hose. See id. They also maintain that "the failure to actually bend the projecting part" would defeat the advantage of a simultaneous

attachment and would result in the 500 Patent simply encompassing prior art. See id. at 19; Record Document 103 at 9.

Conversely, Coupled Products argues that the Nobel Defendants' proposed construction of "deformable finger" adds limitations to the claim and employs words not used by the patentees. See Record Document 81 at 17; Record Document 113 at 138. Instead, it argues that its proposed construction makes clear that the inventor used "deformable finger" to refer to an extension from the first portion 44 and that the example provided, i.e., moving end portion 58 in a counter-clockwise direction towards first portion 42, is within the scope of "deformable." See Record Document 81 at 14. Coupled Products maintains that the use of the numbers and the phrase "such as" in the proposed construction will aid the jury. See Record Document 113 at 91. According to Coupled Products, the phrase "such as" emphasizes to the jury that it is simply reading an example and the numbers readily describe the kind of deformation set forth in the specification, both of which ensure that the proposed construction does not alter the scope of the claim. See id.

At the outset, the Court notes that both sides have presented skilled argument as to the construction of "deformable finger." A detailed review of the record and controlling law leads this Court to construe "deformable finger" as "an extension from first portion 44 that can be deformed, such as by moving end portion 58 in a counter-clockwise direction towards first portion 42." The Court does not believe that such construction will render the claim invalid and/or indefinite. More importantly, the Court finds that the Nobel Defendants' proposed construction does, in fact, add limitations to the claim and relies too heavily upon the preferred embodiment in a case where there is no clear statement of scope set forth

in the patent. See Teleflex, Inc., 299 F.3d at 1328 ("Instead of using the specification as context, the district court apparently limited the 'clip (28)' recited in claim 1 to the embodiment described in the specification. We have cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification. The specification describes only one embodiment of the claimed 'clip (28),' but in the circumstances of this case the record is devoid of 'clear statements of scope' limiting the term appearing in claim 1. . . . Absent such clear statements of scope, we are constrained to follow the language of the claims, rather than that of the written description.").

For instance, the term "bent" narrows the term "deformable." "Bent" refers to a particular kind of deformation. See Record Document 113 at 138. The patentees did not use the term "bent," but instead used "deformable," a known term used in the art. See id.; see also Record Document 81 at 16. The phrase "designed to be bent" is also problematic, as it goes to the subjective intent of the accused infringer and appears to be even more ambiguous than "capable of being deformed," a definition of "deformable" that even the Nobel Defendants refer to in their opening claim construction brief. See Record Document 113 at 138; Record Document 82 at 19.[2] Finally, as discussed previously in this Memorandum Ruling, the phrase "holding the hose assembly securely in place" is ambiguous and adds an additional limitation. There is simply no way to determine what is a secure fit or "securely," particularly because there is no description of "secure" or "securely" in the specification. See Record Document 113 at 138-139.

---

[2]In their Opening claim construction brief, the Nobel Defendants stated that "the suffix *'-able'* can have two different meanings: 'Capable of being . . .' or 'designed to be . . .'" Record Document 82 at 19.

The Nobel Defendants' contention that Coupled Products' construction would render the 500 Patent identical to prior art in the Florence patent is also misplaced. See Record Document 102 at 9. Claims 1 and 8 of the 500 Patent require that the "second portion defining a deformable finger" be "deformed . . . to retain said another hose assembly within said first notch." See Record Document 81, Exhibit A (Claims 1 and 8). The Florence patent required additional hardware for retention. Thus, the Court's acceptance of Coupled Products' proposed construction does not necessarily render the claims of the 500 Patent invalid due to the prior art.

>   D.   **Claim Term: "wherein said second portion is deformed after insertion of said another hose assembly to retain said another hose assembly within said first notch" [Claims 1 and 8]**

| Coupled Products' Proposed Construction | Nobel Defendants' Proposed Construction |
|---|---|
| Plain meaning | wherein the deformable finger is bent into a new shape after the other hose assembly is inserted into the first notch but before the bracket is connected to the steering gear and maintains this new shape so that the hose assembly is held securely within the first notch |

Claims 1 and 8 provide, in pertinent part:

> said first and second portions defining a first notch formed in a perimeter of said bracket and configured to receive another of said first and second hose assemblies *wherein said second portion is deformed after insertion of said another hose assembly to retain said another hose assembly within said first notch*.

Record Document 81, Exhibit A (Claims 1 and 8) (emphasis added).

The Nobel Defendants argue that their proposed construction is supported by the

claim language itself and the specification of the 500 Patent. See Record Document 82 at 20-22. They further contend that construction is necessary because "deformed" is a broad word, such that "one of the ordinary skill in the art" may not be able to determine if he is infringing. See Record Document 113 at 87. The Nobel Defendants also offer many of the same arguments as to this claim construction of both "deformable finger" and "is deformed." Record Document 103 at 8-9.

Coupled Products seeks a plain meaning construction, arguing again that the there is no reason to reword or rewrite the claim language and that the Nobel Defendants' proposed construction adds additional limitations to the claim. See Record Document 113 at 140. Moreover, Coupled Products contends that the Nobel Defendants are once more attempting to read the preferred embodiment into the claim. See id. at 140-142. Like the Nobel Defendants, Coupled Products' arguments as to this claim construction are very similar to those presented against the Nobel Defendants' proposed construction of "deformable finger." See id. at 103, 140.

The Court holds that the phrase "wherein said second portion is deformed after insertion of said another hose assembly to retain said another hose assembly within said first notch" should be given its plain meaning. The patentees assigned no special meaning to this term. The prosecution history also reveals that the Examiner understood this term as being well understood within the art, as he stated in the Reason for Allowance that "the unobvious improvement includes the second portion defining a deformable finger for retaining a hose assembly that deforms after insertion of the hose assembly." Record Document 81, Exhibit B at FH 000014.

The Court further notes that the Nobel Defendants' proposed construction changes

the scope of the claim: it limits "deformed" to "bent"; it adds the limit of "before the bracket is connected to the steering gear";[3] and its adds the function of "maintain[ing] this new shape so that the hose assembly is held securely in place."[4] This proposed construction has added both function and limitation, which the Nobel Defendants seem to have imported from the preferred embodiment.

> E. Claim Term: "wherein said first hose assembly is deformed on either side of said bracket to form first and second beads having a diameter greater than a diameter of said first aperture" [Claim 3]

| Coupled Products' Proposed Construction | Nobel Defendants' Proposed Construction |
|---|---|
| Construe "beads" as ring-like expansions[5] | Plain meaning |

Claim 3 recites:

> The fluid flow assembly of claim 2 wherein said first hose assembly is deformed on either side of said bracket to form first and second *beads* having a diameter greater than a diameter of said first aperture.

Record Document 81, Exhibit A (Claim 3) (emphasis added). Coupled Products argues that "bead" is an unusual term and should be construed as a ring-like expansion. See Record Document 113 at 142. It further maintains that the meaning of "bead" should be drawn from the specification and the abstract. See id. at 145-147. More specifically,

---

[3] This timing requirement is not present in the claim. See Record Document 81 at 21.

[4] The Nobel Defendants' proposed construction adds a requirement that the hose assembly be held "securely" in the notch, while the claim language requires only "to retain" and not "to retain securely." Record Document 81 at 21.

[5] Coupled Products is essentially asking the Court to give this claim term its ordinary and customary meaning, but construe "beads" as "ring-like expansions."

Coupled Products states that "the specification makes clear that the 'beads' are ring-like expansions: they are deformations of the hose assemblies; and they are ring-like because they have a 'diameter' that is greater than the diameter of the aperture through which the hose assembly is put." Record Document 81 at 22.

Conversely, the Nobel Defendants contend that the term "bead" should be given its plain meaning, that is, a single, small round droplet or knob of metal. See id. at 116; see also Record Document 103 at 9. They further note that "one of ordinary skill in the art of manufacturing metal products such as the metallic conduit components of the hose assemblies here would understand "bead" to stand for the intention of a small weld droplet on the circumference of the conduit." Record Document 103 at 9. In sum, the Nobel Defendants argue that construing "bead" as "ring-like" is an addition to the claim language, would radically change the claim language, and fundamentally restate the claim. See Record Document 113 at 116; see also Record Document 103 at 9-10.

While this construction is a somewhat closer call, the Court once again finds that no further construction of the term "bead" or "beads" is necessary and the plain meaning will be used. While Coupled Products makes a substantial argument, the omission from the claim language of such terms as "circumference," "annular," or "ring" is instructive that no such ring-like expansions were claimed for this invention. Rather, as argued by the Nobel Defendants, the reference to "diameter" in the specification suggests to one skilled in the art that measuring the diameter of the hole in the bracket against the diameter of the conduit at the location of the bead results in a larger diameter at the location of the bead. Thus, the Court finds that the meaning of the term "bead" or "beads" is sufficiently clear in the context of the 500 Patent and a plain meaning construction will be applied.

## IV. CONCLUSION.

The Court adopts the constructions set forth in this opinion for the disputed terms of the 500 Patent. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**IT IS SO ORDERED.**

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this the 23rd day of October, 2012.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE